Yeah, I guess we're ready to roll. Hey, this is case one twenty three oh one nine six. Marianne Garbovich as independent executor of the estate of Sylvia Sharon deceased versus DEV Medical Associates SC and Nicholas Evobadis MD. Before us here you have Justice Cynthia Cobb, Justice Aurelia Pudzinski and myself Justice James Fitzgerald Smith. And with that you may proceed with the hearing. I acknowledge that you'll each get ten to fifteen minutes. We will not interrupt unless you get off on a tangent and then we'll ask questions and then the same for the other side and then the conclusion. So with that you may proceed. Thank you Your Honor. Hearing the hearing for the defendants appellants DEV Medical Associates and Dr. Nicholas Evobadis. May it please the court. The primary issues before the court are evidentiary error and closing argument misconduct. First, did the trial court abuse its discretion by barring Dr. Evobadis from bringing to the jury's attention significant facts that supported his medical judgment which plaintiff and her experts directly challenged. And second, was plaintiff's counsel entitled to misrepresent plaintiff's financial status by urging the jury to pull plaintiff out of the red and relieve her of non-existent quote debt unquote for nearly $600,000 in medical bills. A debt neither plaintiff nor neither plaintiff personally nor the estate owed. We've asked the court to grant J&OV or alternatively a new trial or further the alternative to order several ways to correct the judgment. But unless the court directs me to other specific questions or issues I'll use my time today to focus on the primary grounds that we've raised in our briefs. I'll begin with the topics of plaintiff's background as a nurse. She has a bachelor's degree in nursing from Loyola and an MBA. As of the March 2022 trial date, she had 34 years of nursing experience and had the position of director of nursing at Advocate Condell Memorial Center or I'm sorry, Medical Center. That position followed her long nursing career at Resurrection Medical Center from 1988 to 2006 and a number of years at Presence Medical Center. She worked over the course of her nursing career in surgical areas, the recovery room. She rose to leadership positions as manager and director of nursing at these hospitals. Ms. Pagroas agreed that she knew Dr. Berriotas for her many years at Resurrection. These are undisputed facts and yes, impactful. Plaintiff's attorneys fought tooth and nail to keep these facts from the jury at every turn. When the defense raised the issue, plaintiff argued that these undisputed facts would have a profound impact on the way the jury saw the case. The trial court ordered that the jury would not learn these facts about the person who everyone agreed was the one family member who communicated with Dr. Berriotas about Ms. Sheeran's care. The topic was fair game because the plaintiff made it fair game. Don't you think that you're in effect moving the standard of care from one and you're neutralizing or sharing the burden the doctor had and then you're neutralizing it with a person that was not fully informed at all of what the meds changes were? No, Your Honor, that's not what we were doing. What we were doing was to bring forth the facts that would explain Dr. Berriotas, from his perspective, the reasons that he made the medical judgment that he made with respect to Ms. Sheeran's prescriptions. It was not a matter of shifting anything. Plaintiff had this burden of care. Plaintiff remained with a burden of proof and we were simply bringing forth facts. There was no argument or pleading or affirmative defense or anything of that nature that attempted to establish a negligence claim against the plaintiff. But you didn't bring a counterclaim or a contributory negligence claim. That's correct, Judge. That's correct, Your Honor. Again, bringing out the facts to explain the unique circumstances of this case is what the defense was attempting to do. The topic, Your Honor, was fair game because plaintiff made it fair game and Dr. Berriotas was entitled to explain his understanding of plaintiff's medical experience and knowledge and his familiarity with her as a nurse at the hospital's very practice. The basis for the trial court's in limited rulings that the court mentioned now or referred to now was that the jury, was that the issue could not be raised without there being an expert to criticize the plaintiff's conduct. But there was no allegation. There was no pleading. There was no presentation of any type of a claim against the plaintiff. So there was no reason to have any kind of expert testimony on that score. Let me ask you another question. Sure, Your Honor. That being, at no point, at least that I read, did the doctor after this prescription occurred, did he in any time, which is normally done on a weekly basis, give an IVR test to check the level of the medicine in her? In other words, it can vary, and I understand a three millimeter versus a one or one and a half, but were in any of the instructions, was there anything that said break this down and inform the individual that it had changed to that? Nowhere in the record do I find either of those, either the breakdown of the med since it is a change and two, what would have caught that the test if it had been done weekly by the doctor individually to see that her med numbers are way out of sync. So I think there's two questions that Your Honor just posed. One was, where was it written down? The testimony, the instructions for this dosage were communicated according to Dr. Berriotis for his custom and practice of his conversation with the plaintiff as the patient's caregiver. But at that point, he should have given an explanation of the change. I mean, at some point he had to know that there was a difference in the prescription. The doctor testified on the basis of his custom and practice, Your Honor, because he did not have a personal recollection of these circumstances. But he testified that based on his custom and practice, he would never have made a change. It was not a change in what the medicine that the patient was taking, but there was a request and he was absolutely clear that he would not have made or he would not fulfill the request of having a change in the strength of the medication, of one of the medications, to show three milligrams rather than one milligram. And the plaintiff would have had both of those to administer the medication to her mother. At times the patient, the mother, would take one milligram and at times she'd take one and a half. So there was always going to have to be a pill that would be split. So the question that arose then was, was this a convenient way to handle the one and a half? And Dr. Berriotis was absolutely clear that he would not have fulfilled a prescription for a three milligram dosage if he did not have a conversation and an understanding by the caregiver. And as far as a follow-up test, I believe that his practice was to follow up on a monthly basis with an INR test. They're usually done weekly. Most doctors, and I know this personally because our daughter had it and I had it, it was done by any and most doctors weekly because they didn't want to take a chance. They don't trust the nurses. They don't trust the pharmacists. Well, in this situation, Your Honor, there is no criticism of Dr. Berriotis. As Dr. Shadoff said, Dr. Berriotis gave the patient excellent care until there was this problem that arose on this one occasion with a medication. For the number of years that he had been treating her since 2004, this happened in 2016. So it's a different situation and there was no question, but that there was no issue that there was a deviation from the standard of care with regard to the testing. I just have one question since we're already into your argument. Like we said, we weren't going to be. Yeah, I'm sorry. It's just argument. Thank you. But that's fine. Thank you. I just want to be clear. I understand that Dr. Berriotis indicated that he would not have made a dosing change without some conversation communication with either the caregiver or the patient. Is there nothing in the doctor's personal records or is there any expert testimony with regard to maybe the standard of care on record keeping for a doctor in terms of making notes in a file about the change in dosing? On this particular situation, no. But just to go back to what Justice Smith asked me, there actually was, I believe at the end of August, the patient had missed a test for her meds, but that information was barred pursuant to one of plaintiff's motions in limine. So I just want to make sure that the court is understanding of that if there's an issue about that. But no, Your Honor, I'm sorry, Justice Codds, I didn't mean to jump around. But it was not recorded in this instance. And the questions that you're asking that Justice Smith is asking really go to the heart of this issue. And the reason that it was so important for Dr. Arberiotis to be able to explain what his medical judgment was, and it was at a critical part of his medical judgment, was because of the unique situation with this plaintiff, this woman who he had known for years and years and was very reliable and very reliable in his medical judgment. And he was very reliable and in a reliability to follow up on every instruction that he gave to the letter for the care of the patient. » I have a couple of questions. The testimony was that all the prior, all the relevant prior prescriptions were one milligram times six days and one half milligram times one day. And that the new prescription in the doctor's records was one milligram times whatever number of days, 1.5 milligrams times whatever number of days. But somehow at the pharmacy, they changed to one tablet per day. So there's no question that the tablets look different. The old ones were pink. These were yellow. The plaintiff herself acknowledged that the new tablets said a three on them. Now, the plaintiff also acknowledged that she called the pharmacy to find out why the color was different. But there's no testimony that she called the doctor to find out what's going on. So my question is, if she noticed that the pills were a different color, and she later acknowledged that the pills said three, and the doctor's prescription said 1.5 milligrams, then it's not, it doesn't seem unreasonable to believe that the doctor would know she has to cut that three milligram pill in half, which would probably be easier than cutting a one milligram pill in half, although I have no personal experience with this as Justice Smith. But it's not in the record. So we don't know. But one of the experts opined that it would probably be easier to cut a three milligram pill in half than a one milligram pill in half. So at the end of a week after six days, she would be taking six one milligram pills. And that prescription was refilled a couple of days later for the one milligram pills because she was probably out of those. And then she had the three milligram pills to cut it in half. And the expert testified so that she would use a half on one Sunday and a half the next Sunday. Is that your understanding of the testimony? Well, I think that the I think generally that's accurate. So there's two different issues here or two different kind of factual issues. And I think the court captured them. And one is, it's a matter of what is the strength of the pill? That's one thing. And the other one is, what is the actual prescription that the patient is supposed to be taking? So the change here was one of the pill containers, one of the containers had three milligram pills, whereas the prescription stayed the same. As the court recounted, six days of one milligram, one day of one and a half. And I think it was Dr. Convinient to cut a three milligram pill in half for the seventh day as it would be to have the one milligram and cut another one and then take I thought he was talking about sort of running out of the one milligram pills faster after cutting those in half for four of the Sundays. Well, you're going to run out of the one milligram pills faster under that prescription. Yes, I think that's correct, Your Honor. And there was a lot of contention and dispute about the facts. Dr. Abiriotis and the plaintiff had much different testimony. Dr. Abiriotis testimony was he would never have made this change if he had not talked to the caregiver. Her testimony and she must have called it in. Her testimony was I didn't. She had this testimony about having called the pharmacy. That story, frankly, fell apart when we put the pharmacist on the stand who explained that what the plaintiff had recounted, which was that she said she looked at the pill and she did not see the three on it somehow, but called because the color was different and then was told that it depends on the manufacturer. But then the pharmacist from the same pharmacy said, no, if somebody calls about a question like that, the call would not be just taken by whoever picks up the phone. It would be referred to a pharmacist. So that was one of many contentious issues in the case. But back to this question about these in limine rulings. Plaintiff clearly did not want the jury to know what Dr. Abiriotis knows. Abiriotis knew because that was an explanation for the reasonableness of his conduct. But there was nothing confusing about the information that the defense wanted to bring forth. It was a matter of undisputed facts about the plaintiff's background and about the doctor's reliance on her understanding and their long working relationship. No opinion testimony was anticipated or required. So that's in limine. The judge granted the plaintiff's motion in limine number four to deny the motion to reconsider before the trial started. And here we are. We start the trial. Did plaintiff capitalize on that ruling and how? As the trial proceeded, the trial court's error became clear for three reasons. Plaintiff opened the door to testimony about her background through her expert. Dr. Abiriotis was entitled to cross examine plaintiff given the expert testimony and to challenge her credibility. And Dr. Abiriotis, as I mentioned, was entitled to testify to the undisputed facts of plaintiff's background to show the reasonableness of his conduct. So Dr. Shadoff, he's the first witness in the case, plaintiff's cardiology expert, and he claimed that Dr. Abiriotis deviated from the standard of care in authorizing the tablet, the three milligram tablet. And here's his reasoning. Prescribing a three milligram Warfarin tablet in addition to the one milligram would be confusing to the patient or the patient's caregiver. He said patients think in terms of tablets, not milligrams. Through Dr. Shadoff's testimony about a caregiver's so-called confusion, plaintiff opened the door to information pertinent to her understanding and her lack of confusion. So there was an objection. There is a sidebar. Actually, there were two, but there was a sidebar before the cross examination. Then all of that is recounted in another sidebar after this expert testified. But after the court then, during the sidebar, denied the defense request for the court to lift the order and eliminate because the plaintiff had opened the door, the court said no. He continues with cross examination, and Dr. Shadoff then agreed that a physician must judge a caretaker's ability to follow instructions. But then he denied knowing enough about plaintiff's background to determine if she could follow instructions. Of course, everyone in the courtroom, everyone except the jury, knew Dr. Shadoff was aware of plaintiff's professional background and her familiarity with Dr. Beriodas and her ability to follow instructions. That knowledge, actually, on Dr. Shadoff's part, forced him to admit at his deposition, you would expect that a nurse would be capable of following explicit directions and managing medications and dosing. That's a quote. But at trial, Dr. Shadoff told the tall tale on cross examination. He used the trial court's imminent limiting order as a shield to avoid acknowledging what he had stated in his deposition. Then plaintiff on redirect continued to open the door to the truth about plaintiff's understanding that a tablet may contain a different strength of medication compared to another tablet. But Dr. Shadoff stuck to his theory of deviation and he repeatedly testified about non-physicians viewing medication in a certain way. One tablet is the same as another tablet. And that testimony would have and should have been discredited if not obliterated on cross examination. Then plaintiff's counsel on redirect summarized Dr. Shadoff's testimony. And I quote this as well. Your comments are that common lay people are thinking take two Tylenol versus 600 milligrams. End of quote. And Dr. Shadoff answered yes. Non-physicians think of it that way. So that characterization by plaintiff's counsel, that terminology and the expert's testimony could not have more clearly opened the door to cross examination based on what he had reviewed, which included the deposition testimony of Dr. Berriotas and a plaintiff. And that is absolutely the law in Illinois under the Leonardi case. And to Justice Smith's question earlier, you know, raising the question of, well, wasn't there some sort of requirement for expert testimony? When the plaintiff opens the door like that, then that necessity, even if it was there, and I submit that there was no necessity for expert testimony, we can go into cross examination. The door is open without the expert testimony. And I cite two cases that support that position in our brief, the Janky case and the Bryant case. But even for all of that, even the common lay person comment, even the business about how lay people are confused or non-physicians are confused, the trial court would not allow the defense to broach the subject. And that was error, clear error, an abuse of discretion. This is a nurse since the 1980s. But again, the court stuck with this view that there had to be, that this was too prejudicial, it would be confusing. I don't know how that would confuse anybody. She's a nurse. She has all of this medical background. I don't see that that's confusing. And why would there be a need for, those are facts. Why would there be a need for expert testimony? Again, there was no claim, no claim, that there was negligence or counterclaim or contributory negligence or what have you. So at that point, in the sidebar, this is worth noting, and I know I have limited time here today, but following Dr. Shadoff's testimony, plaintiff's attorney made some very telling comments. He stated, plaintiffs will not testify to being confused. And he also stated, he's not going to argue confusing in his closing. So those statements acknowledge what I submit are two critical aspects of the trial. First, the expert's testimony about confusion opened the door to reversing the Illimini Bar. Otherwise, why was plaintiff backing off this whole concept of raising confusion with his plaintiff? And so there's no question, but that acknowledged that raising the issue of confusion required reversing the Illimini Bar, two facts that would have tended to show no confusion. And the second telling aspect of counsel's comments during that sidebar was, and we argued this in the part of our brief asking for J&OV, caregiver confusion was the factual basis for plaintiff's expert standard of care testimony. But according to plaintiffs, evidence of confusion, which was the bedrock of plaintiff's theory, did not exist. So that brings us to the second way in which the Illimini ruling denied Dr. Bariotis a fair trial, the limitation on cross-examination of plaintiffs. And again, I mentioned this again and I won't belabor it, but this was not a case hinging on scientific disagreements between two experts. This was really a case where the plaintiff's credibility was pitted against Dr. Bariotis. So somebody was not telling the truth, is the bottom line. And the dispute was raised again and again, emphasized by the plaintiff in the closing. And so when plaintiff took a stand following her experts, she denied that she saw the label on the container and the label very clearly said on the container, three milligrams. She denied that she looked at this pill, even though as Justice Paczynski noted, what she says she called the pharmacy because she was interested in the change in color, but she didn't notice a milligram. I don't know. She denied that she noticed it. So plaintiff acknowledged in fighting to bar this testimony, that bringing up these undisputed facts of her background would have passed this case in a much different way. And in addition, I would say and to discrediting the expert testimony, but it should have come out. It was part of the case. It was a necessary part of the defense and it was error for the court to bar it. Now the third ruling, and I've talked about this, I won't say too much more about it, but it was a fair trial by preventing him and his expert, Dr. Berger from explaining why it was that Dr. Berger felt confident in relying on plaintiff as the caregiver. And this is, it was set out in the offer of proof and that's in the record at page 1036 of the common law and Ms. Berger's LinkedIn page is also that was part of the offer proof. That's at C1251 of the common law record. Dr. Berger would have explained his familiarity with plaintiff as a knowledgeable nurse, many years of experience and his reliance on her experience of administering medications was a critical component of the defense. That he had chosen an appropriate prescription for the patient's needs. Otherwise his testimony was just, it was not complete. Prejudice. Prejudice. The absence of that testimony gave credence to plaintiff's narrative from the outset of the trial. Her counsel personally attacked Dr. Berriotas as a reckless individual who ignored patient safety. Plaintiff accused him and his counsel of contacting a story simply to have a defense at trial. And in closing called it that they reversed engineered the facts. You know, the jury remained in the dark through all of this. But before reaching a verdict for the plaintiff, the jury never learned the true circumstances of what was in Dr. Berriotas mind when he wrote that prescription. It was impossible for Dr. Berriotas to fully push back on plaintiff's theory and expose the weakness in plaintiff's accusations and the lack of credibility in her version of the events. And to push back on the opening statement where counsel said that Dr. Berriotas ignored safety checks and operated under a system, and this is what she said, of all risks. Now, Dr. Berriotas had to be able to explain why his custom and practice was reasonable under these unique circumstances. So here's the jury. They're thinking plaintiff is a common lay person. With that in mind, they grapple in deliberations with the liability issues. And this is, I think, very significant. For several hours the day of the closing, they started, and the record is to the minute on this, they started deliberation at 2.48 p.m. More than two hours later, at 5.07 p.m., they sent a note to the judge saying they want to see some of the exhibits. And guess what those exhibits related to? Not damages, liability. They wanted to see the picture of the container and they wanted to see the prescription. They were sent home and the judge didn't give it to them. But the jury was sent home that day at 5.30 and then the jury came back the next day and they took a long time to reach the verdict. It didn't come back until after 2 o'clock in the afternoon. So the record as a whole supports our position that undisputed facts undermining plaintiff's expert testimony and plaintiff's credibility and that fleshed out Dr. Berriotas' reasoning would have impacted these deliberations and they entitled to a new trial. So there's one more issue that I want to raise, if I may, and it's plaintiff's improper closing argument. And actually it's related to this first issue I discussed because it's a second way plaintiff's advanced a strategy of urging the jury to reach a verdict based on fiction rather than undisputed facts. Now here's what our counsel argues. He's talking about medical expenses being $578,000 and he says this line item of damage doesn't go into the estate. It doesn't. It goes towards satisfying medical debts, satisfying debts that were incurred. Now defense counsel objects and then the court overrules defense counsel's objection. So now plaintiff's counsel is emboldened and he keeps going. He insists, quote folks allow these medical bills to be paid, allowing them to be paid, simply pulls plaintiff out of the red. This is the easiest damage to award and puts her back at zero. It doesn't take into account the other harms and losses suffered. So this argument violated the rules for closing the argument in several ways. First of all, it's not supported at all by the evidence because it was false. It violated an order in limine precluding reference to the party's financial status. And that was an order in our defense motion limine 4. And even without the order, the reference to plaintiff's inability to pay bills was inflammatory argument on a forbidden subject. It also mischaracterized that plaintiff would be handed the money personally to pay the debt before anything went to the estate. And only then would anything go to the family. And that's just not true. We cited a lot of cases that support our position on this. In particular, the Palmer case we cite and the Carter case talk about raising the question of plaintiff's finances through bills. But there's other cases we cite that stand for the proposition that's well known to this court. You can't talk about the party's finances in an action for compensatory damages. So there's no testimony, no documentation, no documentation, documentary evidence that the claim of an enormous debt for anyone and certainly not plaintiff. So this argument was presented at the end of the trial featuring this accusatory theme that Dr. Abiriotis was negligent and was a liar who didn't care about the patient. It was designed to elicit the jury's sympathy for a person they thought was medically unsophisticated and needy and to stoke their anger against Dr. Abiriotis. So in a brief plaintiff assist, the counsel was just addressing the request for medical bills. And that's provision of history. Counsel did not say, here's the medical expenses. He said, this is a debt. He said plaintiff personally is in the red because of this debt, meaning she couldn't pay it, meaning she didn't have money. So by itself, this is kind of the cause for a new trial and certainly combined these errors too. And the other errors I talked about in my brief, I'll stay on the brief for those. But statements like these don't just impact damages either. This court recognized in the Koonce case, K-O-O-N-C-E, and it's cited in our brief, evidence that on the financial condition of the parties appeals to the sympathy of the jury and urges it to favor the party least able to bear the loss. So the misconduct impacts liability, not just damages. And for these reasons and all the reasons in our brief, I would ask the court to order a new trial or the other relief that we've requested. So if the court has more questions for me, I'll be happy to answer them as best I can. Any questions? I have none. Thank you, Justice. All right. You may proceed. Thank you and good afternoon. May it please the court, counsel. My name is Jonathan Trushansky and I represent the FLE, Marianne Babrovich. The trial court acted well within its discretion on all evidentiary matters brought before this panel and therefore the judgment should be affirmed. The trial court acting within its discretion barred evidence that Marianne was a nurse, was her mother's nurse, and managed her mother's warfarin in her professional capacity. The trial court astutely reasoned that Marianne's profession and conduct were not at issue and the standard of care of her profession was not at issue. Therefore, to allow the profession of Marianne to be brought to the jury, particularly in the manner that defendants intended, would have misled and confused the jury. And make no mistake, by injecting Marianne's profession into the case, a high probability existed that the jury would be confused and misled. Now, defendants 213F3 disclosures, which are part of the common law record starting at page 843, but the relevant parts are 846 to 850, refers to Marianne as, quote, nurse Babrovich and a, quote, well-qualified nurse. By repeatedly referring to Marianne as, quote, nurse throughout the trial, it would have inferred that she was acting as a nurse in a professional capacity to her mother, rather than as a daughter caregiver. By repeatedly referring to Marianne as a, quote, well-qualified nurse, which was the phrase used in the old IPI to describe her professional standard of care, it would instill in the jury that she should have caught Dr. Averiotis' deviation from the standard of care or saved her mother from injury. The trial judge was right. I just have one question about the confusion. I'm not certain I agree with that. If, in fact, the trial judge would have permitted knowledge or information about the plaintiff's profession, do you not think that the jury would have been sophisticated enough to understand that she wasn't dosing her mother in her professional capacity as opposed to her caregiver capacity? I'm not certain I understand or agree with the confusion argument. Well, sure. And thank you for that question. So I think the concern was that if they repeatedly referred to her as nurse or know that she's a nurse, that she would be acting as a nurse in her capacity as a caregiver. I think that was the confusion and it would ultimately shift the standard of care from the doctor to her when the standard of care of the doctor is the issue in this case. And I will also add, just with respect to Ms. Zaglovich's background, yes, it is true that she has a nursing degree. But the last time, and this is undisputed, the last time that she provided patient care was in 1989. There is no evidence that she ever administered Warfarin to a patient, that she was an expert in any way in Warfarin. And since 1986, all of her positions within the medical field have been in an administrative capacity as described in her deposition. She was in charge of things like budgetary concerns, informatics and compliance, nothing that has to do with patient care and certainly nothing that has to do with the administration of Warfarin. So I think that there was definitely concern that if you bring her background as a nurse in, that it would mislead the jury into thinking that she has, that she could have caught the doctor's standard of care deviation or shifted the burden from him to her. Now, I briefly want to touch on just some of the... Just to follow up for a minute. So she was a licensed nurse at the time of the trial. She kept her license, her nursing license, right? That is true. And the difference between the number one and the number three is pretty clear to almost anybody past third grade. Is that correct? Most third graders know the difference between a one and a three. Say fifth grade, say eighth grade. I would agree with that. Okay. And she not only had a bachelor's degree in nursing, she had a master's degree in nursing. Is that correct? I'm not sure if she had a... I don't know off the top of my head. I believe she had a master's in business. Well, it's in the record that she had a master's degree in nursing administration, I believe. Let me just ask you, if we took the word nurse out of the equation and just said that the defense had a right to present to the jury that this is a woman who not only had a business bachelor's degree, but a master's degree, that their impression of her ability to distinguish between a one and a three might have been different than if the defense had said to the jury, this plaintiff didn't finish third grade. Would you agree with that statement? I guess in part, but here's also the issue. What... Does the level of education of a caregiver have some degree of corresponding confidence by the doctor talking to the caregiver? If the doctor is talking to an 18 year old, is that doctor more or less likely to have a lot of confidence than if the doctor is talking to a grown woman with a master's degree? That's my only point. I think that your argument that there's going to be a lot of confusion, I agree with my colleague, Justin Cuff, I'm not getting this. Well, I think also to keep in mind, and this was argued during the motions in Lemonade and trial counsel for the defense even agreed with this, but then Dr. Abiriotis would have given the same dosing directions and the same directions, whether the patient or caregiver was a nurse, an electrician, or a plumber. Right, but the dosing instructions were one milligram six days a week and one and a half milligrams one day a week. And she had one milligram pills and a three milligram pill, which was expected to be cut in half to be one and a half milligrams one day a week. That was the dosing instructions. So I have to push back on that just a little bit because here's why. The factual background of this case is that from September of 2014 until October 28, 2016, she was always, well, let me back up. She started receiving Coumadin Warfarin in 2009. From 2009 until 2016, she was always prescribed one milligram tablets of Warfarin. One milligram six days a week and one and a half one day. Well, the dosing directions, meaning how many Warfarin tablets, the doctor was prescribing, were based off of one and a half milligrams. Correct. So the milligrams that she would have had varied throughout the years based on the PTIR testing. So it wasn't always one milligram six days a week, one and a half milligrams one day a week. That varied. But what stayed the same was that she was prescribed one milligram pill. So for the day that she was taking one milligram, she would take one pill. For the day that she was taking one and a half milligrams, her caregiver would take out one pill, take out another pill, break it in half, and that would be the one and a half. But the thing that I really want the court to understand is that she was always prescribed these one milligram tablets. And what Mary Ann testified to is when she was running low on these one milligram tablets, she called up Walgreens to fill it. She then picks up that prescription on November 5th. And then she starts utilizing that pill thinking that it was a one milligram tablet because she denies ever calling Dr. Averiotis asking him for a change in tablet strength. She never called him. There is no record of her ever calling him. So she doesn't know that two days after she picks up these three milligram tablets, Dr. Averiotis sends in another prescription on November 6th, excuse me, on November 7th for another one milligram tablet. Okay. Wait a minute. She picks up these tablets, the three milligram tablets, and they say traditionally, some of us at Walgreens, other pharmacies, there's two places on the bottle that says what's inside this bottle. On the side, in little small print, it says it's going to be an oval white pill that says W, whatever the physical description of the pill is. And on the front, it says three milligrams warfarin. So there's two places on this bottle that tip her off that this is a different kind of pill than she's been used to picking up. But she didn't call the doctor. She did not call the doctor. She called up Walgreens, asked them about the change in color. So she has one in her hand and she's looking at her. She has them in the bottle and she's looking at them. Oh my gosh, these are yellow, not pink. She doesn't pop one out, put it in her hand and twist it over and say, wait a minute, wait a minute. There used to be a one on these and now all of a sudden there's a three. She did not do that. Is that a correction? She did not examine the pills looking for a one or a three. She said she didn't look at the label. I believe she said that she looked at the label, saw the warfarin on it and saw the patient's name on it. But not that it said three milligrams of warfarin, which would be in the same line on most prescriptions, three milligrams warfarin in the same line. So I'm just confused about your argument that all this nursing background was confusing. I don't think it was confusing. It would just tend to show to an average person listening to all of this, well, how could she not have noticed this? Even if she were a nurse, how could she not have noticed? She had a master's degree. I mean, she's not 18 years old. She quit school at third grade. She's got a master's degree. Right. But I think what that does is it shifts the standard of care onto her as a nurse. The jury... What about her standard of care is just a white person caregiver who notices that, wow, something's different. I should investigate this. And that's their game. And counsel crossed around that and counsel went into that during his closing argument. Why didn't she Google it? Why didn't she call the doctor? That's all fair game. But if you say that she was a nurse, then it would have improperly shifted the burden to her. And there was no... They didn't establish the foundation of her nursing knowledge. I assume that in the jury instructions that there were instructions on the standard of care. Could not any improper inference about the standard of care as it relates to the plaintiff being a nurse have been managed with a proper jury instruction? I'm just really trying to get through your confusion issue and your prejudicial issue about the fact that the plaintiff is a registered nurse. Sure. Well, I'm not exactly sure how to answer that question, but what I will say... Two totally different standards of care and one does not at all apply. And you have a doctor trying to tell the jury what the standard of care is of this person when the person is not... Nobody has given them a standard of care to equate to her. I agree. She can't be considered in the same standard, but yet the defendant is trying to transfer the standard of care from the doctor to the nurse by bringing her in as a nurse. And when you do that, you're forcing in a change in the burden on the doctor when in fact you don't have a standard of care to equate to the nurse. So you can't do that. And that's what I see is the mistake here in that they try to sabotage this by bringing in this without an expert and trying to sneak in a standard of care that didn't exist to neutralize the doctor's duty. And that's why when I ask the other questions, I'm saying the doctor and maybe the defense attorney were negligent here because they didn't do their job. They didn't equate by bringing in an expert to say what this person was supposed to be able to do or not do, whether they got in that she was a nurse or not. They could have brought an expert in and said, wait a minute, this is what we think should have been. And that might have opened the door to equate the two standards. But there's no standard here as to the nurse. So you can't be arguing that this is a nurse. This is a nurse. She's not a nurse for the purpose of this case. Sorry. You know, I listened to all of them. I've listened to Justice Puchinski. I've just listened to Karen DeGran and I listened to Cynthia Cobb. I'm saying this is all good, but it's not the standard of care that you have to equate. And the fact they didn't get a standard of care in this case is surprising to me.  Sorry about that. I now need to address that. My opponent has argued or contends that by looking at the   Averiotis for his medical judgment. I invite the court to really look at Dr. Averiotis' quote-unquote state of mind was that my opponent indicated they were unable to argue. What his state of mind was at the time that he authorized and prescribed the 3-milligram tablet. Dr. Averiotis testified in his deposition that he had no idea why the decision was made to refill Sylvia's warfarin with 93-milligram tablets. No idea. Dr. Averiotis admitted during his deposition that he was quote trying to figure that out as to why the 3-milligram tablet was prescribed. He testified that he prescribed the 3-milligram tablet of warfarin but did not know who requested it or why it was ordered. He said that it could have been the pharmacy who requested it or it could have been the family. He didn't say Mary Ann requested it and I will add that he admitted on cross-examination he has no record of with respect to the 3-milligram strength tablet and the 90 tablet quantity he testified quote yeah, I don't know why they send 90 tablets. Dr. Averiotis testified that he does not remember giving dosing instructions with respect to the 3-milligram strength tablet but that instructions would have been given to the quote family. Mary Ann wasn't specifically mentioned. Dr. Averiotis offered that he communicated medication changes to the quote daughters. Again, he didn't call out Mary Ann. Dr. Averiotis did mention in his deposition that Mary Ann was a nurse but he didn't testify that he prescribed the 3-milligram tablet because of her background. Again, he didn't know why he did it. And so there was no factual basis at least in his deposition as to why he prescribed this 3-milligram tablet. And I'll also say here that the issues that went back to the jury, the issues that they had to determine as to what the standard of care was and whether Dr. Averiotis deviated from the standard of care was one, failure to communicate the change in tablet from 1-milligram to 3-milligram. Number two, failure to communicate the dosing instructions from 1-milligram to 3-milligram. And number three, authorized and prescribed the 3-milligram tablet. Now, with respect to the first two charges, every single expert agrees, including their own expert, that the standard of care for a reasonable, careful cardiologist is that they must communicate a change in the tablet strength when it is made. Everyone agrees to that. Dr. Averiotis got on the stand and says that he has no record of meeting that standard of care. He gets on the stand and he admits that he has no recollection of meeting that standard of care. Mary Ann took the stand. She said, I never requested that change. Why would I? She was unequivocal about that. And so because Dr. Averiotis doesn't have a record or a recollection of meeting the standard of care, he says, well, I would never make the medication change because I would only do it. He essentially says that his custom and practice would be to only change the medication and his custom practice would be to communicate that change in medication. And so he must have followed it. So essentially what his argument was is my custom and practice is to practice within the standard of care. Therefore, I must have practiced within the standard of care. And there is nothing about failing to communicate the change in tablet strength or the change in dosing that has anything to do with Mary Ann being a nurse. Either he communicated the change in tablet strength or he didn't. Either he communicated the change in dosing or he didn't. It has nothing to do with her nursing background whatsoever. And in terms of the third allegation that he authorized and prescribed the three milligram tablet, there was nothing. There was no testimony about confusion. Mary Ann gets up on the stand. She said, I wasn't confused about dosing directions because I never got directions. I wasn't confused about tablets because I didn't know there was a change in a tablet. No one ever told me this. I never requested it. All the medical doctors agreed there was no medical reason for changing the tablet. None. And so that point goes to that third allegation. Now, I know that my opponent indicates that Dr. Shadoff's testimony opened the door because he was testifying that made people think of medications in terms of tablets or milligrams. That's one of the reasons. The fact of the matter is that Mary Ann got up on the stand. And if you read her testimony, she's talking fluently about milligrams. She doesn't refer to it in terms of tablets. She doesn't say that she's confused about milligrams or her tablets. So it's kind of a red herring. And when they're arguing that we have liability from this on Mary Ann's lack of understanding or confusion, that's a classic straw man argument. We did not allege that. Look at the issues in the case. Look at what allegations of deviations of the standard of care went back to the jury. Failed to communicate dosing. Failed to communicate change in tablet strength. We did not allege or authorize and prescribe a three milligram tablet. Nothing in there has anything to do with lack of understanding or confusion. With respect to the closing argument, that was a brief line regarding or explaining the context of damages. That in no part was meant to reference the financial status of the parties whatsoever. I think the trial judge spelled that out in her order well. But furthermore, and I think this is probably the most important point, is that we asked for $578,000 worth of medical bills. And in order to convince the jury to award those, through the closing argument, I went painstakingly through every single hospitalization, the initial hospitalization, the rehab hospitalization, the hospitalization three months after that, the hospitalization several months after that, and the hospice. And I went through all the testimony of all the experts connecting all the dots. And we submitted it to the jury. And the jury came back and they awarded $113,000 less than what was asked for in terms of medical bills. And what that shows is that the jury did exactly what they were charged with doing. They went back in that room. They went over all the evidence and all the testimony. And they went around and they asked each other, what do you think is related? What do you think is not related? And at the end of the day, after looking at all the evidence, they determined that a portion of the medical bills was not related. So there was no, if that line was objectionable, and I contend that it wasn't in the grand scheme of the argument, there was certainly no prejudice because the jury did its job. They sifted through all the evidence in order to determine what was related and what was not related. I'm going to cut you short there. Any questions? Okay, Karen, you can do your closing. Okay, thank you, Your Honor. Let's just start briefly with the closing. This was not one line. This was repeated references to what counsel does not deny today was a false statement that plaintiff herself was personally in the red for almost $600,000. So I don't know what the grand scheme means, but I don't think that there's any case in the state of Illinois that says it's okay if you misrepresent the facts to the jury in the closing as long as it's in the grand scheme. There's not a case that says that, and there's no denial. That just was not true. So I don't think that is any, that gets the plaintiff nowhere, and there's no comment by the plaintiff on the case law because all the case law supports the defense on this. Now, this business of, well, they looked at this carefully anyways, and they knocked off. Let's skip that argument. Let's get to the other arguments. That one we pretty much understand. We don't need any more on it. One last comment, if I may, Judge. The plaintiff's counsel in the rebuttal acknowledged that some of the money should be knocked off because of the attempt to add hospice on. So I think that explains it, not that they weren't impressed. But okay, Judge, I'm sorry. I didn't mean to. I keep going when I shouldn't. Now, let's go back to the other argument. There's quite a bit to unpack here. The big picture part of it is counsel makes a lot of statements about what he would say they said in cross-examination, and this is what he thinks was wrong with Dr. Berryota's testimony, and this is what the plaintiff said. The jury gets to decide who's telling the truth, not the plaintiff's counsel and not the trial judge. It's the jury who's supposed to get the facts. And I have to respectfully disagree with Justice Fitzgerald, and I also disagree with counsel. There's no standard of care issue for the plaintiff's conduct because there was no claim that she was negligent. The only issue was bringing this fact into the case because the plaintiff brought it into the case. And it was brought into the case when Dr. Berryota was accused of negligence in giving this prescription. So the jury was supposed to get the facts, and the jury did not get the facts. The jury was in the dark. Now, this business of finding some testimony in Dr. Berryota's deposition that he said he communicated with someone else, the plaintiff herself at trial said, I was the one person who communicated with Dr. Berryota. Absolutely undisputed as to the trial testimony. If counsel wanted to impeach somebody with that, that would have been whatever, but that's not what the trial testimony was. This business of there's no record of a phone call, but here's what plaintiff's testimony was. Yeah, that's why Dr. Berryota should have been able to give all the testimony that would have called her testimony into question because one of them was lying. And it's our position that it was not Dr. Berryota's. Now, as far as calling her a nurse and the fact that during a pleading or during a deposition, she was referred to as a nurse. That's not what plaintiff's motion in limine number four sought to bar. It didn't say, you can't call her nurse during the trial. It said, and this was the order that was entered and the motions at C175 of the record and the plaintiff and the order shows that it's granted is that prior plaintiff sought to bar defendants from arguing, referring to and or eliciting testimony from any witness that Mary Ann Bergois was or is a nurse. So it wasn't just you can't call her a nurse. Okay. It was much more than that. They couldn't go into her background. This was not a matter of a nursing standard of care. It was a matter of explaining what the circumstances were and what the reasoning was of this doctor who was accused of a breach of the standard of care. So just opening the door, that is, I have to respectfully say that counsel misstated Dr. Shadoff's testimony. He must have said at least five times that the reason that there was a breach of the standard of care was because there would be confusion by the caretaker because the caretaker would not appreciate or might not appreciate the difference and might be confused. So yes, confusion was all over his testimony. And that's why the trial counsel went and said to the judge, they've opened the door. And this wasn't just, this was not just the expert. He talked that way, but it was plaintiff's counsel, plaintiff's co-counsel who got up and said, okay, so we're talking about a common lay person. If there was any reason for the judge, and I'm sure she was trying to do the right thing, but if there was any reason for the judge to enter that order in limine, the door was open for the election of the plaintiff's attorney and the plaintiff, I'm sure herself. So that was not, there is no way to read this record and say that the plaintiff didn't raise the issue of confusion. The plaintiff raised it. And then to Judge Paczynski, I follow up on Judge Paczynski's comment. We're not talking about somebody, and so I have to respectfully disagree with Justice Gerald Smith. Nobody was going to get in there and say there was something that the plaintiff should have done or was supposed to do because she was a nurse or for any reason. It was, here is the perspective of what Dr. Arbariotis understanding was. And he understood her to be somebody who definitely would be able to follow the instructions. And honestly, and I think Justice Swieczewski hits it on the head. I find it less unbelievable for someone with this background to say, oh, well, this pill looks different. I'll call the pharmacy. And then I talk to just the person answering the phone. And I'm not going to look at the bottle that says three milligrams. And I'm not going to look at the pill. And I'm not going to call the doctor. So I think we've got a big credibility question. Now, that was for the jury. That was for the jury. So that's what we're talking about. There's nothing confusing about the fact that she was a nurse and had this training and that Dr. Arbariotis relied on that. Not confusing at all. So that's our position. And I hope I've answered any questions that the court might have. Any questions? All right. Well, both of you, this is probably the longest we've let you guys go on a case. But it was very interesting. And both of you were very, very well prepared. So I appreciate your effort and time. And we'll probably have to go back to the drawing board now. So thank you. Thanks so much, Your Honors. Hey, Counsel. Thank you. Thank you, Counsel. Thank you. Good on, Justice Smith.